## FISHER FLOURING MILLS CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. January 31, 1927.)

No. 4712.

**I. Arbitration and award �kö=1—Remedy under state statute for settlement of disputes by arbitration held exclusive (Rem. Comp. Stat. Wash. § 420 et seq.).**

The remedy prescribed by Rem. Comp. Stat. Wash. § 420 et seq., for the settlement of disputes by arbitration, is exclusive.

**2. Arbitration and award ⊫=2—Common-law arbitration held entirely supplanted by state statute (Rem. Comp. Stat. Wash. § 420 et seq.).**

Common-law arbitrations are entirely supplanted by Rem. Comp. Stat. Wash. § 420 et seq.

**3. Arbitration and award ⊫=80—Validity of award must be determined by law of state where agreement and award was made.**

Validity and effect of arbitration award must be determined by the law of the state where the agreement to arbitrate was made, the arbitration had, and the award made.

**4. Arbitration and award ⊫=86—Under Washington law, arbitration award, not followed by judgment, is not competent evidence (Rem. Comp. Stat. Wash. § 420 et seq.).**

Under law of Washington, particularly Rem. Comp. St. Wash. § 420 et seq., an award of arbitrators, not followed up by judgment, is not competent evidence for any purpose, being analogous to verdict of jury, which may be set aside by court.

**5. Courts ⊫=348—Under conformity statute, federal courts will follow state courts in matters of evidence in common-law actions.**

Under conformity statute, a federal court sitting in Washington will follow the decisions of the highest court of that state in the matters of evidence in common-law actions, unless Congress has provided otherwise.

**6. Arbitration and award ⌾⟹29—State may take away common-law powers of arbitrators.**

State Legislature has power to limit or take away the common-law powers of arbitrators.

**7. Courts ⌾⟹339—Giving conclusive effect to arbitration award not followed by judgment, as required by state statute, held error (Rem. Comp. Stat. Wash. § 420 et seq.).**

In action by the United States, as assignee of injunction bond, it was error for court to give conclusive or any effect to an award of arbitrators made in Washington, but not followed by judgment, in conformity with Rem. Comp. Stat. Wash. § 420 et seq.

**8. United States ⌾⟹130—In action by United States, state laws relative to right of set-off will not control.**

In an action by the United States, as assignee of injunction bond, state statute, relative to right of set-off of claims against government's assignor, held not controlling.

**9. United States ⌾⟹130—In action by United States as assignee of injunction bond, refusal to allow set-off of claims not previously presented to Treasury accounting officers held not error (Rev. St. § 951 [Comp. St. § 1588]).**

In action by the United States, as assignee of injunction bond given in suit against the United States Emergency Fleet Corporation, refusal to set off claims against the Fleet Corporation which had not been presented to accounting officers of the Treasury for their examination, as required by Rev. St. § 951 (Comp. St. § 1588), held not error.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Edward E. Cushman, Judge.

Action by the United States against the Fisher Flouring Mills Company and others. Judgment for the United States, and defendants bring error. Reversed, and cause remanded for new trial.

See, also, 295 F. 691.

H. H. A. Hastings and L. B. Stedman, both of Seattle, Wash. (J. B. Howe and D. G. Graham, both of Seattle, Wash., of counsel), for plaintiffs in error.

Thomas P. Revelle, U. S. Atty., and Chas E. Allen, both of Seattle, Wash., for the United States.

Before RUDKIN, Circuit Judge, and SAWTELLE and JAMES, District Judges.

RUDKIN, Circuit Judge. August 9, 1920, the United States Emergency Fleet Corporation, acting through its managing agents at Seattle, chartered the steamship Yosemite to the Fisher Flouring Mills Company and the White-Dulany Company, to carry grain from Puget Sound to European ports. The charter party provided that the rate should be $20 per long ton, that loading should not commence before October 15, 1920, and that if the vessel was not tendered ready for loading on or before 12 o'clock noon of November 15, 1920, the charterers should have the option of canceling the charter party. October 29, 1920, the steamship Westward Ho was substituted for the Yosemite under a right reserved in the charter party. Neither the Yosemite nor the Westward Ho was tendered or delivered for loading at the time agreed upon, and the charterers contend that they then agreed with the managing agents of the Fleet Corporation that the Eastern Mariner should be substituted in the place of the other vessels, and that the substituted vessel should be berthed for loading at the dock of the Harbor Island Dock & Warehouse Company at 8 o'clock on the morning of November 22, 1920. They further contend that the original charter party was canceled on the latter date for failure to tender or deliver the vessel for loading as agreed.

After the arrangement was made to have the Eastern Mariner at the dock ready for loading on November 22, 1920, the Flouring Mills Company notified the manager of the dock that the vessel would be at the dock on the morning of November 22, and that he should then proceed to deliver cargo. On November 26, 1920, four days after the date agreed upon, the Eastern Mariner was berthed alongside the dock in question, and the manager of the dock began loading cargo under the instructions which he had received prior to November 22. As soon as the charterers were advised of that fact, they threatened to remove the cargo from the vessel unless they were given a rate of $18 per long ton, which was the prevailing rate on that date. The managing agents of the Fleet Corporation contended that the placing of cargo on the vessel constituted an acceptance of the original charter party, but after some further negotiations it was finally agreed that the charterers would load the vessel with cargo, that a bill of lading would be issued carrying an $18 per ton rate, and that the question whether the $20 or the $18 rate should be paid, would be submitted to arbitration. On the same day the managing agents addressed a letter to the charterers, saying:

"As we have telephoned you to-day, we, however, suggest so that no injustice be done, that you continue to supply cargo for this steamer, and that we will submit the entire matter of whether the terms of the original charter as to rate are in effect and you are bound by same, to arbitration. We can appoint a board of arbitrators, you to select

one member, we to select one; and the two to select a third, and both parties will be bound by the decision of this board. In the event the arbitration board should decide against us, we agree to the new $18 Shipping Board rate as put into effect to-day, with Shipping Board terms of discharge."

The offer to arbitrate was accepted under date of December 1, 1920, each party selecting an arbitrator and the two thus selected selecting a third. December 23, 1920, a majority of the arbitrators decided that the $20 per ton rate should prevail; one arbitrator dissenting therefrom. Later a controversy arose over the arbitration, and, under date of January 14, 1921, the managing agents of the Fleet Corporation notified the charterers that, in view of the fact that the charterers had brought proceedings to cancel the findings of the arbitration board, they would demand the payment of the $20 rate at the port of discharge before delivering the cargo. Thereupon the charterers commenced an action in the state court against the managing agents and the Fleet Corporation, to restrain them from collecting the $20 per ton rate, or any other rate in excess of $18 per ton, before delivering the cargo. Upon the commencement of that action a bond in the sum of $25,000 was executed by the plaintiffs therein and the American Surety Company, conditioned to indemnify and save harmless the managing agents and the Fleet Corporation from any and all loss or damage suffered by them, or either of them, should it be adjudged in that or any other action that the restraining order was wrongfully sued out. Whether because of the injunction or not, the cargo was delivered to the consignees upon the payment of the $18 rate.

The action in which the bond was given was thereafter dismissed on motion of the plaintiffs therein, the injunction bond was assigned to the United States by the managing agents and the Fleet Corporation, and the present action was then instituted on the bond to recover the difference between the $20 rate and the $18 rate, amounting to the sum of upwards of $15,000. Among other defenses interposed, the answer set up two offsets in favor of the charterers and against the Fleet Corporation for damages sustained by the former because of delay in the shipment and delivery of previous cargoes. A demurrer to these affirmative defenses was sustained, and upon the trial the court directed a verdict in favor of the government for the full amount claimed. The judgment on the verdict is now before us for review.

The court below ruled that the decision of the arbitrators was final and conclusive as to the freight rate, and that no offsets could be pleaded against the government unless the claims were first presented to the Accounting officers of the Treasury for their examination, as provided in section 951 of the Revised Statutes (Comp. St. § 1588). The principal assignments of error are based on these rulings.

The Legislature of the state of Washington has prescribed a comprehensive and exclusive scheme for the settlement of disputes by arbitration. Section 420 et seq., Rem., provide that any controversy, suit, or quarrel, except such as respects the title to real estate, may be submitted to arbitration; that the submission shall be in writing; that the award of the arbitrators shall be filed in the office of the clerk of the superior court of the county wherein the arbitration is held, and shall be entered on the records of the court; that the party against whom the award is made may except thereto in writing, for certain causes; that if, upon exceptions filed, it shall appear to the court that the arbitrators have committed error in fact or law, the court may refer the cause back to them, directing an amendment of the award forthwith, returnable to the court, and on failure to so correct the proceedings, the court shall be possessed of the cause and proceed to its determination; and that the award, when affirmed, shall be in all respects like any other judgment of the Superior Court.

[1] As already stated, the Supreme Court of the State has repeatedly held that the remedy thus prescribed is exclusive of all others. Thus, in Tacoma Ry., etc., Co. v. Cummings, 5 Wash. 206, 208, 31 P. 747, 33 P. 507, the court said:

"An arbitration at common law was of such a nature that the decision of the arbitrators was not subject to control by the courts, excepting by a formal action brought for that purpose, but it is perfectly clear from our statute that the arbitration therein authorized is entirely different, so far as the question of the control of the award by the court in which it is required to be filed is concerned. Under our statute the award is not so far a finality that in itself it can be in any manner enforced against the defeated party until it has been acted upon by the court. Before it gets any force which can be made available by the successful party, a judgment must be rendered thereon by the court into which it is returned. If no exceptions are filed against such award within the time prescribed by law, such judgment fol-

lows as matter of course. If, however, exceptions are filed as authorized by statute, then the court is called upon to determine whether or not such exceptions are well taken."

[2] The decision in that case has been repeatedly reaffirmed by the same court, and it has become the settled law of that jurisdiction that common law arbitrations are entirely supplanted by the state statute. Dickie Mfg. Co. v. Sound Const. & Eng. Co., 92 Wash. 316, 159 P. 129; Suksdorf v. Suksdorf, 93 Wash. 667, 161 P. 465.

[3,4] The agreement to submit to arbitration was made in that state, the arbitration took place there, the award was made there, and the validity and effect of the award must be determined by reference to its laws. And if this action had been brought in a court of that state on an injunction bond given in an action there pending, it seems manifest that the award of the arbitrators would not have been competent evidence for any purpose. It is analogous to the verdict of a jury, which may be set aside by the court, and establishes nothing unless followed up by judgment.

[5,6] Under the conformity statute, a federal court sitting in that state will follow the decisions of the highest court of the state in matters of evidence in common law actions, unless Congress has provided otherwise. Ex parte Fisk, 113 U. S. 713, 5 S. Ct. 724, 28 L. Ed. 1117; Camden and Suburban Ry. Co. v. Stetson, 177 U. S. 172, 20 S. Ct. 617, 44 L. Ed. 721; Stewart v. Morris (C. C. A.) 89 F. 290. It seems too plain to admit of discussion that the Legislature of that state had power to limit or take away the common law powers of arbitrators, and that the public policy of the state as declared by its Legislature in that regard cannot be set at naught because of some supposed common law pervading the entire Union.

[7] The court below erred, therefore, in giving conclusive or any effect to the award of the arbitrators, and for that error the judgment must be reversed, because, with the award of the arbitrators out of the way, there was ample testimony to warrant the jury in finding that the original charter par-

ty, upon which the defendant in error relied to establish its damages, was abrogated and canceled by the charterers for failure on the part of the Fleet Corporation to deliver the vessel for loading at the time and place agreed upon.

[8,9] If this action was prosecuted by the Fleet Corporation, a right of set-off would probably exist under the laws of the state; but in actions by the United States the state statute is not controlling. In discussing this question in Hall v. United States, 91 U. S. 559, 562, 23 L. Ed. 446, the court said: "Questions of the kind, where the United States are plaintiffs, must be determined wholly by the acts of Congress, as the local laws have no application in such cases."

Again, in United States v. Cantrall (C. C.) 176 F. 949, 954, it was said: "A set-off is a creation of the statute, and did not exist at common law. In an action brought by the United States, if it exists at all, it is conferred by St. § 951, and, before it can be asserted in a court, it must appear that the claim has been presented to an accounting officer of the Treasury and disallowed, or the pleadings must bring the case within some of the exceptions specified in the statute."

The government does not often sue on assigned claims, as was done here, and for that reason the question has usually arisen where attempts were made to offset claims against the government itself; but if no offset can be interposed in an action by the United States, except as provided by Congress, it would seem to follow that an offset not falling within the provisions of section 951 of the Revised Statutes is not available as a defense. The court did not err, therefore, in sustaining the demurrer to the answers setting up claims in favor of the defendants below and against the Fleet Corporation.

The remaining assignments of error call for no discussion, as the rulings complained of were not prejudicial, and will probably not occur on another trial.

For error in directing the verdict in favor of the defendant in error, the judgment of the court below is reversed, and the cause is remanded for a new trial.